United States District Court for the
Western District of Pennsylvania

Aaron Sloan,
    Pro Se Plaintiff
        v.
Melissa Hainsworth; David Onstead;
Daniel Gehlmann; Jeffrey Shaffer;
Robert Snyder; Gerald Rozum;
Trevor Winsgard; Mark Baker;
Robert Bakos; Heidi Sroka; S.E. Hause;
Officer Harr; Officer Flick; Officer Redmun;
Officer Kim; Officer Swank; Officer Hazen;
Officer McNiven; Officer Killinger;
Officer Burley
        Defendants

C.A. No. 3:14-cv-00249
Jury Trial Demanded
District Judge Gibson
Magistrate Judge Baxter

RECEIVED

JUL 27 2018

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## Amended Complaint

Plaintiff brings this action against the above named defendants on the following cause of action:

## I. Jurisdiction & Venue

1. This is a civil action authorized by 42 U.S.C. §§ 1983, 1985(2) and (3), and 1986 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. § 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This court has supplemental jurisdiction under 28 U.S.C. § 1367.

2. The Western District of Pennsylvania, Johnstown, is an appropriate venue under 28 U.S.C. 1391(b)(2) because it is where the events giving rise to these claims occured.

## II. Parties

3. Plaintiff was at all times mentioned herein a prisoner of the state of Pennsylvania in the custody of the Pennsylvania Department of Corrections at SCI-Somerset.

4. All of the named defendants in this action were employed at SCI-Somerset for the DOC. Defendants are all sued in their individual capacity

## III. Preliminary Statement

5. Between April 24, 2012 and September 24, 2013 Plaintiff was held captive at SCI-Fayette. As an outspoken prisoner that believes in standing up for the Rights, Privileges and immunities guaranteed to him and others under the constitutions, statutes, codes, laws and regulatory policies of the United States, Pennsylvania and Department of Corrections ("DOC"). To exercise this outspokenness against wrong-doing Plaintiff uses -in this particular instance- the grievance procedures of the DOC, of which occurs frequently. Due to Plaintiff using the DOC grievance procedures against SCI-Fayette prison offizials, a Stephen Buzas repeatedly refused to take any corrective measures against the wrongs being committed against Plaintiff and repeatedly threatened the Plaintiff with further harassment, property destructions and disciplinary action from him and other prison offizials. Stephen Buzas further stated that such action would be taken by him and other prison offizials if Plaintiff's grievance filing didn't stop and on the request of SCI-Somerset prison offizials. However, Plaintiff continued to file grievances about prison offizials wrong-doing with several of them naming Buzas as directly involved or unsuccessfully attempting to Resolve my issue(s) with/through him. As a result of this, offizer J.M. Malsch (malsch) submitted a disciplinary report against Plaintiff alleging that Plaintiff exposed his penis to malsch and Nurse Rutherford (Rutherford) and used obscene language toward malsch. However, when Rutherford was called as a witnessed for the hearing on the disciplinary report she testified that malsch's allegations were false - of which resulted in Plaintiff not being found guilty. Later the same day of that hearing Buzas told Plaintiff that the disciplinary report was filed as a result of Plaintiff filing grievances. When Plaintiff asked malsch several days later as to why he filed the false disciplinary report malsch stated that Buzas told him to. Buzas further told Plaintiff that if he continued to file grievances against prison offizials that he would receive more disciplinary reports and more time to be served in atypical and significant hardship solitary confinement. Refusing to be deterred from standing against wrong-doing, Plaintiff continued to file grievances against prison offizials such as, including but not limited to, Buzas - of which resulted in Plaintiff receiving another false disciplinary report and more time to be spent in atypical and significant hardship solitary confinement. Due to these acts of prison offizials Plaintiff intended to file a 42 U.S.C. § 1983 petition to the courts seeking punitive, compensatory, declaratory and prospective relief via a jury trial asserting claims of retaliation and conspiracy under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1985 & 1986 against Buzas, and malsch and offizer Smith.

6. Between the dates of April 24, 2012 and approximately June 26, 2012 SCI-Fayette Prison officials loss, destroyed and/or stole fifteen (15) religious books, one (1) religious magazine, one (1) calendar, two (2) handbooks, seven (7) catalogs, nine (9) magazines, two (2) legal books, fifteen (15) information pamphlets, three (3) newspapers, ninety-seven (97) photographs, thirty-four (34) books; and, inter alia, two three (3) books written by Plaintiff - all of which belonged to Plaintiff. After acquiring all the necessary documentation of having this property and Prison officials losing, destroying and/or stealing this property, Plaintiff submitted a grievance about Prison officials mishandling of his property with the documentation attached that was given the grievance #419477. Because these destructions, loss and/or stealings of Plaintiff's personal property was committed by Officers Yauger, Zueger, Anderson and Skrobacz with the assistance of Unit Manager Stephen Buzas and Unit Clerk Jane Doe - all of who were named in complaints filed by Plaintiff about these issues. As a result of grievance #419477 (419477) being processed for response, on September 18, 2012 Officer Prescott, Officer Palmer, Sargeant Bogucki, Lieutenant Hawkinberry, Yauger and Buzas searched the Plaintiff's cell under the false pretense of searching for the missing property - of which Plaintiff never had in his possession. During the course of this search a substantial amount of Plaintiff's property - that was unrelated to the missing property at issue in 419477 - was thrown in the garbage without documentation and against Plaintiff's protest. After the search was completed and it was seen that none of the missing property at issue in 419477 was in Plaintiff's possession, Buzas began to question and harass the Plaintiff and attempt to manipulate/coerce and threaten the Plaintiff into discrediting the claims he made in 419477. Such was done by Buzas calling Plaintiff a liar, alleging that Plaintiff destroyed his own property, and, amongst other things, stating that the property taken out of Plaintiff's cell during the search would be left in the garbage if changes to the facts were not made by Plaintiff. Upon Plaintiff refusing to give in to the manipulation/coersion and threats, his property was left in the garbage without documentation or proper authorization - of which is strictly prohibited by Prison guidelines on search and handling prisoner property by Prison officials. Due to these acts by Prison officials Plaintiff intended to submit a 42 U.S.C. §1983 petition to the U.S. District Court setting forth claims of Retaliation, denial of due process, Negligence and assumpsit under the U.S. Constitution and Pennsylvania statutory and common laws and seeking punitive, compensatory, declaratory and prospective relief against these named officers.

7. In the approximate month of November or December 2012 Plaintiff was sent a flower from a recently deceased family members funeral and leafs from a tree planted in memorium of another of Plaintiff's deceased family members that was planted with the decedents hair. When the flower and leafs arrived at SCI-Fayette for Plaintiff prison offizials immediately confiscated such claiming that Plaintiff was not permitted to have them. Plaintiff then submitted informal and formal requests and complaints to prison offizials to mail them back out the jail and subsequently, about them being destroyed. Plaintiff never received a response to any of his informal or formal requests/complaints and the flower and leafs were destroyed without Plaintiff's consent and against prison guidelines on the handling of prisoner property by prison offizials. Due to these acts Plaintiff intended to to initiate a state tort claims of assumpsit and negligence under Pennsylvania statutory and common laws in Fayette County Court of Common Pleas seeking punitive and compensatory damages against SCI-Fayette Business Manager Mike Oppman, mailroom supervisor Darlene Linderman, and maillady Moses.

8. Plaintiff has been muslim since he was 13 years of age. As a muslim, Plaintiff has adhered to the tenets of his sincerely held religious belief in Islam by performing acts such as, including but not limited to, fasting for the Islamic holy month of Ramadan. Plaintiff fasted for Ramadan's for years while in society, detention centers, county prison, and state prisons. While at SCI-Albion in 2007, SCI-Forest 2008, and SCI-Camp Hill in 2010 prison offizials accommodated Plaintiff so that he may fast for Ramadan. While at SCI-Somerset in 2009 and 2011, and SCI-Fayette in 2012 prison offizials refused to accommodate Plaintiff for Ramadan or allow him to utilize any alternatives so that he may fast for these years on written and verbalized orders and agreements of, including but not limited to, the Secretary of Corrections, Religious Services Director, and the superintendents, chaplaincy directors and unit managers of SCI-Somerset and SCI-Fayette. As a result of prison offizials refusals to accommodate Plaintiff so that he may fast for the Ramadans of 2009, 2011 and 2012, and the Islamic feasts that followed each Ramadan, Plaintiff was forced to choose between his health and the immediate threat to it and adhering to his sincerely held religious belief in fasting for Ramadan and participating in the Islamic feasts. Plaintiff was forced to make this decision when there was available

alternatives such as, including but not limited to, Plaintiff being placed on a behavior modified meal - of which would be done if Plaintiff was to be accommodated for Ramadan and misused food items and/or materials - or food loaf, accommodating Plaintiff for Ramadan, permitting Plaintiff to save food from regular trays so that he may fast on his own within the cell, or debit Plaintiff's account - as was done in approximately Sept. or Oct. 2012 - for the amount of the feasts so that he may participate in the feasts. Due to this substantial burden of Plaintiff's sincerely held religious belief in fasting for Ramadan and participating in feasts when this was not the least restrictive means available, and available alternatives were not attempted, Plaintiff drafted a fourteen (14) page civil complaint against the Secretary of Corrections, Religious services director, religious superintendent and chaplaincy director at SCI-Somerset, and Superintendent, chaplaincy director and unit manager Stephen Butas under 42 U.S.C. §1983 setting forth claims under the Free Exercise Clause of the U.S. Constitution, Religious Land Use and Institutionalized Persons Act of the U.S. Code, and under the Pennsylvania Religious Freedom Protection Act. This fourteen (14) page civil complaint was to be sent to the Johnstown U.S. District Court with the Requested Relief of punitive, compensatory, declaratory & prospective relief and a trial by jury. As Plaintiff had an extremely limited amount of supplies, Plaintiff attached this complaint - of which was in an envelope - to a Request slip to SCI-Fayette librarian L. Cutter with two (2) cash slips requesting copies be made in December 2012. Plaintiff submitted this Request by giving it to officer S. Miller and officer Palmer and them taking it to some unknown location. In December 2012 an officer Smith returned this Request to Plaintiff with no reason ever provided as to why it was being returned or as to where the complaint was for it was no longer attached to the Request slip and cash slip. As a result of this loss, Plaintiff was unable to pursue his religious violations claims by submitting them to the court. Plaintiff then submitted a formal grievance about the loss/destruction of this complaint by miller, palmer, Smith and/or Cutter. On the approximate date of January 28, 2013 Plaintiff was in the strip-cage of SCI-Fayette's L-Block - of which is next to the L-Block lieutenants office. While in this strip-cage overheard a Lt. Switzer and Captain Walker talking about Plaintiff's lossed complaint and stated that Palmer, Smith and Miller admitted Plaintiff's claims of the complaint getting lossed was true, and then Switzer called another official and admitted Plaintiff's claims were true. Switzer then spoke to Plaintiff in the strip cage saying he was to respond to Plaintiff's formal grievance and that mailroom staff and Cutter

would have to be contacted for staff and testimony supported Plaintiff's claims. On that same day of January 28, 2013, an extension was granted on the time to respond to Plaintiff's formal grievance - though on that date prison officials still had approximately twelve (12) days to investigate and respond to the grievance - and switch the person that was to respond to the grievance. Approximately two (2) months after the incident occured, and approximately a month after Switzer stated that Miller, Smith and Palmer corroborated Plaintiff's claims, & Mike Oppman responded to Plaintiff's formal grievance alleging that no official could recall any specific's, and other officials alleged at another time that things were properly received and returned. These things were alleged when Plaintiff attached evidence to his grievance to substantiate his claims, and when Plaintiff subsequently filed another formal grievance with substantial amounts of evidence attached to show prison officials falsified testimony to discredit Plaintiff's claims against them prison officials refused to acknowledge and respond to such. Due to these acts of Palmer, Switzer, Miller, Smith, Cutler and Oppman Plaintiff intended to submit a 42 U.S.C. §1983 petition to the Pittsburgh U.S. District Court against these officials setting forth denial of access to court and conspiracy claims under the Access to Court and Due Process Clauses of the U.S. Constitution. and requesting relief of punitive, compensatory and declaratory relief and a trial by Jury.

    9   Plaintiff is an outspoken prisoner that believes & in standing up for the rights, privileges and immunities guaranteed to him and others under the constitutions, statutes, laws, codes and regulatory policies of the U.S., Pa. and D.O.C., and inforcing such rights, privileges and immunities through written and verbal communications to federal, state and administrative courts, agencies and persons. When violations occur. Due to Plaintiff submitting written and verbal complaints against prison, medical and dietary officials, during Plaintiff's stay at SCI-Fayette, between APR. 2012 and Sept. 2013, prison, medical and dietary officials acted out a campaign of harassment, sensory deprivations, cruel and unusual punishments and falsifications against Plaintiff to keep him in atypical and significant hardship solitary confinement for an exceptionally longer period of time. This was done by prison officials doing such things as, including but not limited to, entering false/inaccurate information into prison records/reports that alleged Plaintiff destroyed prison property, argued with other prisoners, threatened prison officials & refused medical and/or mental health treatment, denying Plaintiff proper bedding materials, denying Plaintiff recreation

for months-long time periods; denying Plaintiff Proper hygiene materials; and putting Plaintiff in cells with little to no ventilation or air circulation, that had fecal matter of others throughout the cell, were bug infested and that had extremely bright lights that did not turn off or dim without a disciplinary violation having to be committed to turn off or dim the light; denied Plaintiff adequate meals; and tampered with Plaintiff's food; and denying Plaintiff advancement through the Special Management Unit ("SMU" "PROGRam"); and denied Plaintiff medical treatment and interfered with medical treatment for conditions already documented. As to bedding materials, since approximately January 2008 until April 2012 Plaintiff had always been Provided with a cotton blankets or suicide blankets for safety and security reasons and due to wool blankets interferring with Plaintiff's breathing. However, while at sci-Fayette Buzas Repeatedly took the cotton blankets given to Plaintiff without a legitimate Penological interest supporting the taking, Refused to give Plaintiff any alternative(s) to a wool blanket other than having nothing, and denied Plaintiff all bedding material other than one sheet and a mattress for approximately one month with no legitimate Penological interest supporting such a decision. For over approximately seven (7) years Prior to Plaintiff's arrival at sci-Fayette he was diagnosed with I.B.S. Though this medical condition Resulted in Plaintiff needing to use more tissue than is Routinely Provided to level 5 Prisoners, Prison and medical offizials Refused to accommodate Plaintiff's medical condition. Prison dietary offizials are Required to obey and follow the written menu Prescribed by the D.O.C. Registered dietitian. Rather than follow the menu Prescribed for Plaintiff, sci-Fayette's dietary offizials blatantly disregarded such and Repeatedly served Plaintiff food items that endangered Plaintiff's health and life. Prison Policy and Procedure strictly mandates that all meals be Prepared and Portioned out by dietary staff and workers. sci-Fayette's L-Block staff would Routinely violate this mandate and Repackage and Reportion Plaintiff's meals in unsanitary ways and environments by Persons not Properly trained and/or authorized to do so. Plaintiff had medically Prescribed glasses that were broken during his Apr. 24 2012 transfer to sci-Fayette. Though Prison and medical offizials were Put on Notice of Plaintiff glasses being broken and, therefore, confiscated, Plaintiff was not Provided new medically Prescribed glasses and once he was Provided new glasses they were inadequate for no form of exam was done to determine the Prescription needed - of which took approximately nine (9) months to get the new inadequate Pair of glasses, with no explanation for the delay. Plaintiff went from approximately August 1, 2012 until approximately February 14, 2013 without Receiving any disciplinary Reports. During this time Period, Plaintiff Participated in all Recreation offering, law library

time periods made available to him, shower offering, attended every Program Review committee (PRC) meeting scheduled for him, and watched every therapuetic video available for the Smu Program - excluding the times these activities were not made available to him. Despite Plaintiff doing all that was required of him for his time to serve in solitary confinement under disciplinary custody (DC) status reduced and/or held over his head, such was not done though other prisoners in the Smu on the same phase as Plaintiff who received multiple disciplinary reports and refused numerous activity offerings received DC status reductions and/or suspensions. Through written and verbal communications and documentation Plaintiff informed and showed that SCI-Fayette Prison officials were conspiring against Plaintiff, and Retaliating against Plaintiff for filing complaints against prison officials and/or saying he would file complaints against them, and requested the Review of documentation and video evidence to support his claims that prison officials were conspiring, Retaliating and/or lying against Plaintiff. These written and verbal communications and submissions were made to supervisory officials, who in turn violated by taking affirmative steps such as lying, destroying and disregarding facts/evidence to conceal staff wrong-doing and blatantly disregarding the conspiracy's, Retaliations, falsifizations and mistreatments Plaintiff was being subjected to. Due to the wrongs Plaintiff was subjected to and officials Refusing to take action(s) on such, Plaintiff intended to submit a 42 U.S.C. §1983 petition to the U.S. District Court against the secretary of corrections, Regional deputy secretary, and SCI-Fayette superintendent, deputy superintendent, L-Block Unit Manager and captain, dietary and medical directors/staff, lieutenants, sargeants, counselors and officers setting forth claims of Retaliation, conspiracy, denial of due process (substantive & procedural) and, failure to protect and supervise, and deliberate indifference under the free speech, Equal Access to court, cruel and unusual punishment and Due process clauses of the U.S. Constitution, conspiracy under 42 U.S.C. §1985(2), and failure to act under 42 U.S.C. §1986. For Relief in the intended suit, Plaintiff intended to Request punitive, compensatory, declaratory, prospective and Remedial Relief, and trial by jury.

10. Since the approximate age of 7 years of age Plaintiff has been treated for and as having sleeping and mental health disorders by mental health professionals while in society and juvenile facilities. Plaintiff was prescribed a host of medications for his sleep and

mental health disorders. ~~In~~ In approximately June 2007 or earlier Plaintiff was diagnosed as having Anti social Personality Disorder (ASPD) and noted issues with sleep. ASPD is a type of chronic mental condition in which a person's ways of thinking, perceiving situations and relating to others are dysfunctional - and destructive. People with ASPD are typically unable to fulfill family, work, school and social responsibilities. ASPD is considered a lifelong disorder that becomes fully evident for most people in their 20s and 30s and is accompanied by impulsivity, explosions of anger, social isolation, poor performance of responsibilities, significant irritability, agitation, agression, unnecessary risk-taking or dangerous behaviors, poor relationships, irresponsible behavior, and failure to learn from the negative consequences of behavior. During Plaintiff's housing at sci-Fayette he was diagnosed with, and ~~considered~~ considered as having, ASPD and primary insomnia - of which has been shown to significantly worsen the symptoms of other mental health issues and can decrease the effectiveness of certain treatments. ~~Prior~~ Prior to Plaintiff's housing at sci-Fayette's SMU between Apr. 2012 and Sept. 2013, Plaintiff spent five (5) consecutive years in solitary confinement. During these 5 years ~~as~~ Plaintiff was accused of, found guilty of and/or had it documented that he committed over one hundred (100) disciplinary infractions and acts of self-harm/self-mutilation. These acts and infractions were for things that are to include, but not be limited to: setting himself and his cell on fire two seperate times, starving himself, attempted suicide by strangulation, self-mutilation through ramming his head into a door and banging his head ~~on~~ on doors, exhibitionism, destructions of property, poor hygiene, threatening staff, filing grievances that prison officials disagreed with the claims made, refusing to return food trays, and throwing fluids on others - all of which are symptomatic of the disorders Plaintiff had and displayed - and resulted Plaintiff getting time to be served in solitary confinement that extended to approximately June ~~2027~~ 2027, when his time to serve in prison expired in 2019. Prior to Plaintiff's arrival at sci-Fayette's SMU, he had already shown he was unable to complete an SMU program by failing another SMU program a mere ~~approximately~~ ten (10) months earlier. Though prison policy, mental health professional and vocational standards,

and National Commission on Correctional Health Care, American Psychiatric Association and Criminal Justice Mental Health Standards Literature, Position Statement(s) and Standards say that Prisoners such as Plaintiff are to be seen by a Psychiatric Review team (PRT), have an Individual Treatment Plan (ITP)/Individual Recovery Plan (IRP) developed and Provided to them after they Participate in its creation and sign it for the purpose of guiding their Reintergration into a prisons Population. Reviews with mental health staff are to be done in a confidential setting/manner, and, amongst other things, ~~officers~~ their housing in segregation/solitary confinement for a duration longer than three (3) to four (4) weeks should be avoided due to the potential for harm to the prisoner, such was completely disregarded with Plaintiff in SCI-Fayette's SMU. The SMU is the most harshest, segregated and restrictive form of solitary confinement @ within the D.O.C. Plaintiff was never seen or offered to be seen by any PRT for any reason, was never offered to be present for or provide input for any ITP/IRP or to receive any copies of such, was not provided any confidentiality, was never assessed by any mental health staff for any disciplinary infractions hearings before, during or after the infraction occured, the disciplinary Report was issued or the hearing was held. No assessment was done even when Plaintiff was issued a disciplinary Report - and was sanctioned secondary to the issuance of that Report - for attempting suicide. No Plan(s) was made to Reintergrate Plaintiff back into a Population. Due to these wrong-doings committed by Prison and mental health staff Plaintiff intended to submit a civil complaint to the Pittsburgh U.S. District Court against the D.O.C., secretary of corrections, and SCI-Fayette's superintendent, SMU staff, and mental health officials. The claims Plaintiff intended to make were to be set ~~forth~~ under 42 U.S.C. §1983, Cruel and Unusual Punishment Clause of the U.S. Constitution, Americans with Disabilities Act and Rehabilitation Act of the U.S. Code, and Due Process and Equal Protection Clauses of the U.S. Constitution for officials subjected Plaintiff Prolonged isolation without adequate/competent treatment for his mental health issues, adverse actions due to the symptoms of his mental health issues without consideration of those issues, exclusion from participation in and denial of the benefits of the services, programs and activities of the SMU due to Plaintiff's mental health issues when

other similarly situated and disabled persons were provided such, an elevated standard of conduct to be eligible for receipt of SMU and mental health and population services, programs and activities without reasonably modifying the rules, policies or practices, and, amongst other things, failure to refer plaintiff to ~~competent~~ competent professionals trained and licensed to treat persons with issues such as or similar to those possessed or displayed by plaintiff. When they were made available to plaintiff, the only services, programs or activities available to plaintiff were one(1) hour of recreation five(5) days a week, law library two(2) to four(4) hours a week, verbal communication through a solid steel door with a psychologist for approximately five(5) minutes one(1) day a week, one(1) accepting responsibility video, one (1) cage your rage video, and verbal communication through a steel door with a psychiatrist for approximately five(5) minutes once every thirty (30) to ninety(90) days. In the populations and/or housing units for those with mental health issues at SCI-Fayette and/or other D.O.C. prisons, a wide variety of services, programs and activities are available. There are things such as, including but not limited to, educational services, law library for six(6) to eight(8) hours a week with law library staff and reference aides, vocational training, employment, religious services, group mental/emotional therapy, physical education/training classes, parenting classes, social service, money management/accounting classes, contact visitation, bingo, confidential mental health services. For relief on these allegations and claims plaintiff intended to request compensatory, punitive, declaratory and prospective relief, and trial by jury.

11. On the dates of approximately November 30, 2007 plaintiff was issued a disciplinary report by prison official Christopher Byerley alleging that plaintiff set the cell he was in on fire - allegations that plaintiff was found guilty of and sanctioned ~~the~~ an assessment of the cost of the damage done. Similar allegations were made against plaintiff on the approximate date of December 14, 2007 - and a same sanction issued. Though prison policy - plaintiff and these incidents were at SCI-Albion - mandated that an assessment hearing be held to determine the amounts to be assessed, and to afford a prisoner such as plaintiff with due process, no assessment hearings was ever offered to plaintiff and I presumably, none was ever held. For these same two(2) alleged incidents, plaintiff was criminally charged in 2 seperate cases. For the sentencing in these 2 seperate cases plaintiff was sentenced to pay $100.00 in restitution - for prison

officials at Sci-Albion told the Erie County District Attorney's office that each alleged incident caused $100.00 in damages. On the approximate date of October 23, 2007 a Sci-Albion prison official Boyd Sullivan issued Plaintiff a disciplinary report alleging that Plaintiff damaged a sink in a cell - for which Plaintiff was found guilty and sanctioned an assessment of the cost to repair the sink. Though prison policy mandated that an assessment hearing be held to determine the amount to be assessed, and to afford a prisoner such as Plaintiff with due process, no assessment hearing was ever offered to Plaintiff and, presumably, none was ever held for this alleged disciplinary infraction or any others. On the approximate June 30, 2004 Plaintiff was arrested and charged with a criminal act. Due to being charged Plaintiff was sentenced to serve time in prison and, presumably, to pay victim compensation of no more than eighty dollars ($80.00). Plaintiff made payments for victim compensation for this case in the amounts of $15.00 on December 10, 2007 and $2.50 on October 5, 2007 - of which left approximately $63.50 needing to be paid. In August of 2013 Plaintiff had funds credited to his prison account. As a result of this $162.98 was deducted from his account as a misconduct assessment for the alleged November 2007 fire, $46.12 was deducted as a misconduct assessment for allegedly damaged sink, $67.50 was deducted for the June 2004 criminal cases victim compensation, and $25.40 was deducted as a misconduct assessment for unknown allegations. This resulted in the following: 1. The Plaintiff being overcharged $62.98 for the alleged fires damages cost through misconduct assessment when an assessment hearing was never properly held and would result in Plaintiff being assessed one time through misconduct assessment and a second time through criminal restitution assessment and, therefore, paying double the amount required to get paid for one allegation; 2. Plaintiff being assessed $46.12 without a proper assessment hearing being held; 3. Plaintiff being overcharged by $4.00 for victim compensation; and, 4. Plaintiff being assessed $25.40 without a proper assessment hearing being held. Plaintiff was unsuccessful in having his funds returned through prison formal grievance procedures. Due to these acts of prison officials Plaintiff

intended to submit a 42 U.S.C. §1983 petition to the Pittsburgh U.S. District Court setting forth his claims under the Due Process and Takings Clauses of the U.S. Constitution. For relief Plaintiff intended to seek punitive, compensatory, declaratory and prospective relief, and a bench trial.

11. Plaintiff initiated a 42 U.S.C. §1983 civil action against SCI-Somerset prison officials captioned Sloan v. Pitkins, et al., C.A. No. 3:13-cv-00104 (W.D.Pa.). Within the complaint Plaintiff made claims against a nurse Jane Doe and officer John Doe over them denying Plaintiff medical treatment after prison offizials physically assaulted him. In Pitkins, Magistrate Judge Susan Paradise Baxter (Baxter) issued an October 7, 2014 order directing that the last discovery request for this case had to be made on or before December 9, 2014 and all dispositive motions had to be submitted on or before January 23, 2015. The Pitkins case was initiated May 16, 2013. This gave Plaintiff 120 days from May 16, 2013 to ~~approximately~~ serve Jane Doe and John Doe. However, a John/Jane Doe cannot be served by the U.S. Marshal. This in-turn requires the discovery and review of evidence to identify Jane Doe and John Doe. Plaintiff intended to discover and review evidence from the defendants named in Pitkins to set forth claims of deliberate indifference under the U.S. Constitution and medical negligence under Pennsylvania statutory/common law against John Doe and Jane Doe ~~and~~ and request punitive and compensatory damages in amounts to be determined by a jury.

12. Plaintiff initiated a 42 U.S.C. §1983 civil action against prison officials at SCI-Somerset about a continuous pattern of wrong-doing Plaintiff was subjected to at SCI-Somerset between June 2, 2011 and April 24, 2012 captioned Sloan v. Coutts, et al., C.A. No. 3:12-cv-00079 (W.D.Pa.). In the complaint for Coutts Plaintiff alleged violations of U.S. and Pennsylvania constitutional and statutory law by doing things such as, including but not limited to, denying Plaintiff meals, denying Plaintiff meals that were in accordance with his noted food allergy restrictions, denials of medical treatment for obvious injuries/ailments, failing to protect Plaintiff from attacks by prison offizials and/or other prisoners, assaulting

the Plaintiff, withholding and/or destroying Plaintiff's mail and property, threatening the Plaintiff, interferring with Plaintiff testifying for federal court proceedings, and subjecting Plaintiff to adverse actions for submitting complaints against prison officials. To substantiate these claims Plaintiff intended to, and would be required to, conduct a substantial amount of discovery, examination of evidence, witness questioning & preparation, trial preparation & presentation, and, amongst other things, determine levels of, and questioning of, credibility. This would all have to be done with and through a defense attorney unwilling to amicably resolve disputes or perform mandated duties for personal and reasons not support by law, rule of court or legitimate penological interests.

140. Plaintiff initiated a civil action in the Cumberland County Court of Common Pleas by way of the issuance of a summons so that Plaintiff could conduct pre-complaint discovery to acquire the necessary facts to file a complaint against SCI-Camp Hill prison officials setting forth a state tort claim of damaged/defective state property caused Plaintiff property damage. Instead of docketing Plaintiff's summons as a summons, the Cumberland county prothonotary docketed such as a complaint. Due to this clerical error that took approximately three (3) months to correct, Plaintiff was unable to have the summons served on SCI-Camp Hill prison officials in a timely enough manner to marshal the facts and file a civil complaint in the time established by rules of court when a civil action is commenced via summons. This resulted in Sloan v. Klopotosky, et al., Docket No. 12-7863 civilterm being dismissed. Under Sloan v. Klopotosky, et al., No. 1381 CD 2013, Plaintiff appeal the Cumberland county dismissal to the Commonwealth Court of Pennsylvania with the intention of raising the argument of, with Plaintiff's inability to properly and timely file a complaint in the trial court being caused by the prothonotary's clerical error, and requesting that, the circumstances calling for the remand of Klopotosky to the trial court with instructions to permit Plaintiff to conduct pre-complaint discovery and file a complaint within a time period to be determined by the court. Under the Pa. Rules of Appellate Procedure, when appealing to an appellate court the appellant/petitioner is to reproduce the record and file a brief

within particular time limits and fashion with four (4) copies of both being required. Upon remand by the Commonwealth Court of Pennsylvania and adequate discovery, when Plaintiff submitted his complaint he intended to request punitive and compensatory damages and a bench trial.

## IV. Statement Of Facts

15. From April 24, 2012 until approximately September 24, 2013 Plaintiff was housed at State Correctional Institution (SCI)- Fayette. While at SCI-Fayette, Plaintiff was given authorization to have four (4) boxes of property — one (1) box for any personal property of Plaintiff's choice and three (3) boxes of all legal property- in the cell with him due to prison officials verifying that Plaintiff was actively pursuing seven (7) seperate court cases on his own. This authorization was to last unit May 29, 2014.

16. While still at SCI-Fayette on September 22, 2013, Plaintiff was told and taken to pack his property for a permanent transfer to another SCI. With Plaintiff knowing from experience that during transfers between SCI's that prisoner's property is routinely destroyed by prison officials, Plaintiff packed as much of the vital legal paperwork for his pending cases into one (1) **box** as he could in the hopes that most, if not all, of his vital legal paperwork would not become lossed and/or destroyed. When Plaintiff was transfered from SCI-Fayette to SCI-Somerset on Sept. 24, 2013 only two (2) of the six (6) boxes of property he owned was sent with him. When Plaintiff arrived at SCI-Somerset — his third time there — and the two (2) boxes of property were inventoried in the intake area, the box with some of his vital legal paperwork was not present. On the approximate date of Sept. 27, 2013 Plaintiff's other four (4) boxes of property arrived at SCI-Somerset. As Plaintiff had packed as much of his vital legal paperwork into one box as he could prior to his transfer, when he was taken to inventory the four (4) boxes by SCI-Somerset's Restricted Housing Unit (RHU) staff on Sept. 27, 2013 he exchanged the box of property he had for the box that was supposed to have the vital legal paperwork in it. However, when Plaintiff was returned to a RHU cell and went through that box the vital legal paperwork was no longer present.

17. Due to knowing that all the paperwork he would need to diligently pursue his pending and intended court cases would not fit into one box that he was permitted to have at that time, Plaintiff submitted an Oct. 3, 2013 request slip ("DC-135A") to Deputy Superintendent of Facility Management Daniel Gehlmann (Gehlmann) requesting to have approval to have four (4) boxes of property

in the cell with him like he had at SCI-Fayette while at the same time providing the captions to eight (8) court cases he was pursuing on his own — a Request that was submitted to Gehlmann as he was the one designated to deal with such Requests at SCI-Somerset. Secondary to Gehlmann Requesting to be provided with documentation that the approval was granted at SCI-Fayette, Plaintiff submitted an Oct. 10, 2013 DC-135A to Gehlmann making Reference to his Oct. 3 DC-135A to Gehlmann, attaching a copy of the Legal Property Exemption ("Exemption") form that showed Plaintiff had approval from SCI-Fayette to have three (3) extra boxes of property in the cell with him until May 29, 2014, and Requesting immediate approval of the Exemption Request. Though prison policy mandated that Gehlmann provide a Response to Plaintiff's Oct. 10 DC-135A within five (5) working days, Gehlmann Refused to do so.

18. Due to not Receiving a Response from Gehlmann for his Oct. 10, 2013 DC-135A to Gehlmann about his Exemption Request, Plaintiff submitted October 23 and 29, 2013 DC-135A's about, amongst other things, Gehlmann's Refusal to address such. Though Gehlmann Received, and Responded to, Plaintiff's Oct. 23 and 29 DC-135A's to him, Gehlmann Refused to address Plaintiff's complaints about no Response to his Exemption Request.

19. Secondary to the misconduct of Gehlmann, Plaintiff submitted a Nov. 8, 2013 formal grievance # 485300 (485300) complaining of as to how Gehlmann Repeatedly Refused to address Plaintiff's DC-135A's to Gehlmann about Exemption approval at SCI-Somerset and as to how such was negatively effecting Plaintiff's ability to pursue his pending and intended court cases. As Relief in 485300, Plaintiff Requested: punitive and compensatory damages, declaratory and prospective Relief, and, amongst other things, to get the legal property exemption he already had. Though SCI-Somerset Grievance Coordinator Heidi Sroka (Sroka) picked up 485300 on November 8, 2013, she withheld 485300 from being date stamped as Received and processed — to let Gehlmann know of the filing of 485300 — all the way until Nov. 13, 2013 and listed 485300 as being Received on Nov. 13, 2013 and entered it into DOC Records in violation of Pennsylvania Department of Corrections' ("DOC") Rules and Regulations strictly prohibiting prison officials from intentionally entering false, inaccurate or improper information or data into DOC Records or Reports.

20. On the night of November 13, 2013 — the night of the same day that 485300 was finally date stamped as being Received and processed by Sroka — Plaintiff finally Received his Oct. 10, 2013 DC-135A to Gehlmann back with the Exemption attached. On the Exemption form Gehlmann wrote that he approved Plaintiff to have three (3) additional boxes of legal property, that he forwarded copies of the Exemption form to SCI-Somerset Lieutenants (Lt.) Jeffrey Shaffer (Shaffer) and S. Harr (Harr), and that a copy of the Exemption form was put on file.

21. On Dec. 5, 2013 a Correctional Officer ("CO") Hostetler and CO Gibson took Plaintiff to a secluded area within SCI-Somerset's RHU and left him with Majar Melissa Hainsworth (Hainsworth), at which time Hainsworth told Plaintiff that she was assigned to investigate and respond to 485300 and that if Plaintiff would sign for the withdrawal of 485300 that she would have RHU staff give Plaintiff his authorized extra legal property that same night. Upon Plaintiff refusing to sign for the withdrawal of 485300 due to prison officials already having had almost two (2) months in which they could have given Plaintiff his needed extra legal property, Hainsworth said that due to Plaintiff's refusal to withdraw 485300 and making her have to go through the trouble of filing a response she would make it difficult for Plaintiff to get his extra property.

22. On the night of Dec. 6, 2013 Plaintiff received Hainsworth's Dec. 5 response to 485300, in which she claimed that Plaintiff's SCI-Somerset RHU file indicated that Gehlmann had approved Plaintiff to have the same approval he had at SCI-Fayette - of which was to have one box of property of Plaintiff's choice and three boxes of extra legal property in the cell with him - and that she verified with SCI-Somerset's RHU staff that Plaintiff would received what he was approved for. Though required to work in accordance with directives issued by superior officers, and though she verified Gehlmann's approval for Plaintiff to have extra property in the cell with him, Hainsworth disregarded Gehlmann's approval for Plaintiff to possess extra legal property and worked in accordance with her Dec. 5, 2013 declaration of intending to make it difficult for Plaintiff to get the extra property he was approved to have for refusing to withdraw 485300 by denying Plaintiff's requested relief in 485300 - of which was to get his extra legal property - and preventing Plaintiff from ever acquiring the extra legal property needed.

23. Though acting as the officers tasked with controling the immediate functioning and operation of SCI-Somerset's RHU on the night of Dec. 6, 2013, Harr and sargeant officer Burley (Burley) refused to provide, or direct that Plaintiff be provided, Plaintiff with the extra legal property he was authorized to have even though Plaintiff showed the exemption documentation and Hainsworth's response to 485300 verifiing that Plaintiff have the required approval, with Burley stating that his denial was on instruction of Hainsworth and her denial of the grievance and its relief.

24. Plaintiff received a January 14, 2014 letter/notice from the Commonwealth Court of Pennsylvania ("CCP") informing him that he had a set filing deadline to submit four (4) copies each of his appellate brief and reproduced record for Sloan v. Klopotosky, et al., No. 1381 C.D. 2013. This prompted Plaintiff to make a continued attempt to gain access to and possession of his stored

and extra legal PROPERTY to get the needed PAPERWORK from before and after Receiving such from the CCP by making approximately twenty (20) verbal and/or written Requests to Officer Kim (Kim), Officer Swank (Swank), MARK Baker (Baker), Officer McNiven (McNiven), Officer Hazen (Hazen) and Burley between Dec. 6, 2013 and Feb. 24, 2014. Though Kim, Swank, Baker, McNiven, Harr, Hazen and Burley all had the necessary authority and ability to either Provide, or direct that such be done, Plaintiff with the need access and possession, they all Refused though Plaintiff showed documentation showing the Exemption was authorized by Gehlmann to have the PROPERTY in the cell with him.

25. When Plaintiff was unsuccessful in gaining the need access to and possess of his stored and extra legal PROPERTY, Plaintiff submitted formal Grievance #498846 (498846) complaining of as to how he never received the authorized Extra Exemption PROPERTY though it was verified by Hainsworth in 485300, Shaffer and Harr Received copies of the Exemption form, a copy of the Exemption form was put on file. Plaintiff made numerous Requests to Rhu staff, and Rhu staff had ample opportunity to provide Plaintiff the needed access and possession when they did other Rhu prisoners' properties. Plaintiff Requested as Relief in 498846 to get, amongst other things, the four(4) combined boxes worth of legal and personal property he was authorized to have. Though policy of the DOC Restricted her from assigning a staff member as the grievance officer to Respond to a grievance they are involved in or named as a subject of, Sroka blatantly disregarded this provision and assigned Harr to Respond to 498846.

26. With the Knowledge that he was prohibited from serving as the grievance officer for, or Responding to, 498846 for he was directly involved in and a named subject of the grievance, Harr blatantly disregarded this Restriction, with the assistance and approval of Sroka, and took false and manipulatory steps to deny 498846 and its claims against Harr and other officials by falsely alleging that Plaintiff Refused to produce a copy of the Exemption's authorization documentation, that Plaintiff's Refusal occured on a day that he was not even in SCI-Somerset, and that Plaintiff's alleged Refusal calls for the denial of 498846 for a copy of the Exemption form was not in Plaintiff's folder. Then 498846 and its Relief - e.g., the extra legal PROPERTY possession - were denied. None of this happened on or before March 14, 2013 as alleged by Harr.

27. As a Result of SCI-Somerset Prison officials Refusing to provide Plaintiff with access to and possession of his stored and extra legal PROPERTY, Plaintiff was unable to meet the filing Requirements for an appeal to the CCP and Klopotosky was dismissed.

28. Due to the dismissal of Klopotosky being the Result of Prison

offizials Refusal to Permit Plaintiff access to or Possession of his stored and extra legal Property in violation of the Exemptions approval. Plaintiff submitted formal grievance # 506600 (506600) complaining of as to how the wrong-doing of Prison offizials caused Klopotosky to be dismissed while at the same time attaching the filings of Klopotosky as evidence to support his claims. In Providing a Response to 506600 Shaffer assisted in, joined in, and continued to act out ~~×××××××××××~~ SCI-Somerset Prison offizials Refusal to Permit Plaintiff access to or Possession of his stored and extra legal Property he was approved to have by using Harr's allegation in 498846 that Plaintiff Refused to Produce a copy of the documentation for the Exemption, alleging that Ritu staff denied ever denying Plaintiff access to his stored legal Property, and claiming that it was Shaffer's belief that

Plaintiff was being manipulative to get unjustied financial compensation as grounds to deny 506600 and find it frivolous. Shaffer made such a determination and defamatory allegations against Plaintiff ~~when~~ he knew Plaintiff was approved to possess extra legal Property for Gehlmann Provided Shaffer with a copy of the Exemption form. in 485300 Hainsworth verified the approval and said that the approval was noted in Plaintiff's Ritu file and said that it was verified with Ritu staff - e.g., Shaffer, Harr, Kim, Swank, Baker, McNiven, Hazen, Burley, amongst others - that Plaintiff would Receive his approved Property. in 498846 Plaintiff made specifiz Reference to 485300's claims. Ritu staff never Provided Plaintiff with the extra Property he was approved to have, specifiz Reference was made in 498846 to Shaffer's Personal involvement in denying Plaintiff access to or Possession of his Property, and, amongst other things, Plaintiff attached evidence to 506600 to support his claims.

   29. Though Doc Policy mandated that Shaffer - as the grievance offizer for 506600 - Provide Plaintiff with a copy of his Response to 506600 by May 13, 2014, Shaffer authored his Response to 506600 and then Refused to Provide Plaintiff with a copy of it and, therefore, Prevented Plaintiff from challenging/appealing the allegations in Shaffer's Response to 506600 or acquiring access to or Possession of his extra legal Property to Pursue his Pending and intended Court cases.

   30. On the morning of May 9, 2014 a search was done on SCI-Somerset's Ritu as Part of a Planned course of action Prior to Offizer Redmun (Redmun), S.E. Hause (Hause) and Offizer Flick (Flick) taking Plaintiff out of the cell so that it may be searched. Plaintiff showed these co's the documentation showing he was Permitted to Possess extra Property in the cell. After Reviewing this documentation Redmun, Hause and Flick stated that they would not take any of the extra legal Property Plaintiff had as if

it was within the three (3) box limit of extra property he was approved for.

31. As Plaintiff was held outside the cell by Hause and watched the search be done, Redmun acted in violation of DOC Rules and Regulations mandating that prisoner property be handled with extreme care and all precautions be taken to avoid any damage to it and mandating that certain requirements be met prior to property designated officials dispose of any prisoner property. Redmun did so with the assistance and agreement of Flick by making the on-the-spot determination to throw away three (3) pens belonging to Plaintiff, seven (7) computer printed photographs of Plaintiff's loved ones, and two (2) declarations authored by other prisoners about wrongs prison officials subjected Plaintiff to when they knew such was directly against DOC Rules and Regulations.

32. Just as the search was being completed Shaffer came and directed Redmun and Flick to take all of Plaintiff's legal property due to prior grievances Plaintiff filed against Shaffer though Redmun, Flick and Hause stated that Plaintiff had documentation saying he was approved to have all of the legal property in the cell and Shaffer was shown this documentation - of which included the Exemption form Gehlmann provided to Shaffer.

33. Plaintiff then called Captain Robert Snyder (Snyder) over to the cell and informed him of the wrongs that were being committed by, or on the direction of, Shaffer against Plaintiff's property and then showed Snyder documentation that Plaintiff had properly requested and was approved by Gehlmann to possess three (3) extra boxes of legal property in the cell with him, and then reminded Snyder that the same documentation had resulted in Snyder and three (3) other prison officials permitting Plaintiff to keep his extra legal property during a Feb. 28, 2014 search of SCI-Somerset's RHU. Though Snyder stated that he recalled the same documentation resulting in him permitting Plaintiff to keep all his extra legal property on Feb. 28, 2014, and that Gehlmann's approval did not expire until May 29, 2014, Snyder and Shaffer came to a verbal agreement to act in violation of DOC Rules and Regulations and take Plaintiff's legal property wrongfully.

34. After Snyder left, and Hause and Flick switched places, Redmun and Hause acted in violation of DOC Rules and Regulations, with the assistance, agreement and approval of Shaffer, mandating that prisoner property be handled with extreme care, all precautions be taken to avoid any damage to prisoner property, that only properly designated authorities destroy prisoner property, that security consult with a Major prior to the destruction of prisoner property, and that a prisoner be given the chance to challenge any intended destruction of prisoner property. Shaffer, Redmun and Hause did so, despite Plaintiff's protests and objections, by carelessly separating and boxing Plaintiff's property that resulted

in irreparable damage to four (4) of Plaintiff's books and four (4) of his magazines, and making on-the-spot determinations to throw Plaintiff's legal property in the garbage two (2) times during their search.

35. To conceal the wrong-doing Plaintiff's property was being, and had been, subjected to, and though DOC Rules and Regulations mandated that a Confiscated Items Receipt ("DC-154A") be issued to record all taken/confiscated prisoner property, when Redmun wrote a DC-154A for Plaintiff's property Shaffer destroyed this DC-154A and directed that DC-154A # B098684 (B098684) be written for the property that was confiscated and no DC-154A be written for the property destroyed/damaged, and, subsequently, when Redmun attempted to write another DC-154A for Plaintiff's property Shaffer destroyed this DC-154A stating that no DC-154A was to be issued for Plaintiff's destroyed/damaged property.

36. Plaintiff continued to protest and object to the wrong-doing his property was and had been subjected to - i.e., confiscation and destruction. Shaffer then directed Hause and Redmun to take Plaintiff's mattress - for which they did - stating that such was being taken due to Plaintiff's continuous complaining and that it would not be returned until the complaining stopped - of which resulted in Plaintiff being denied a mattress for two (2) days and being made to sleep on cold, hard steel by Hazen and Sargeant Officer Killinger (Killinger) with both stating it was on orders of, and, therefore, in agreement with, Shaffer.

37. After Plaintiff was placed back into the cell he continued to protest and object to the wrongful treatment his property was subjected to. Shaffer, and Hause, Redmun and Flick on direction of Shaffer, then took, and had taken, affirmative steps to conceal the wrongs committed by prison officials against Plaintiff's property, under the statement that he knew how to play with policy, by authoring and/or signing into agreement with it being falsely/inaccurately alleged on B098684 that on May 9, 2014 Plaintiff was only authorized one (1) box of cell contents and that Plaintiff refused to choose what property to keep - when Plaintiff was not given a choice - and selecting to mark on DC-154A # B098686 (B098686) random materials out a trashbag - that went through approximately seven (7) other prisoners cells before it got to Plaintiff's cell - and claiming they belonged to Plaintiff.

38. Plaintiff then requested that the trashbag that contained his property be held so that he may file a formal grievance about the wrongful destruction of his property and appeal, but Shaffer refused to do so and directed officer J. Sossong to destroy such - of which was done.

39. Though Gehlmann and Hainsworth were put on notice of the ~~continued~~ wrongful confiscation and destruction of Plaintiff's property and the retaliatory acts he was subjected to through the receipt of BO98684 and BO98686, verbal communications from prison offizials - of which Gehlmann stated on May 13, 2014 that he received the communications ~~communication~~ when he came to the RHU after the search - on May 9, 2014, notations made in Plaintiff's unit team file and/or Inmate Cumulative Adjustment Record ("ICAR") by Unit Manager Mullishan, Psychology Service Specialist Stevens and/or Counselor Knepper, and, amongst other things, Plaintiff submitted DC-135A to Gehlmann dated May 11, 2014 by giving it to a CO Foster on the night of May 11, 2014 and it being put in the mail, Gehlmann and Hainsworth refused to take any corrective measures or direct their subordinates to take any corrective measures or enforce compliance with the Exemptions authorization. The refusals of Gehlmann and Hainsworth took place even though on May 13, 2014 Gehlmann stated that he received Plaintiff's May 11, 2014 DC-135A about the May 9, 2014 searches incidents and Plaintiff sent four (4) follow-up DC-135A's to Gehlmann and Hainsworth for they were the ones who approved the Exemption and verified the approval existed and had the required duty/authority to remedy the wrongs that had and were occuring.

40. Due to the wrongs Plaintiff and his property were subjected to by Snyder, Shaffer, Hause, Flick and Redmun on May 9, 2014, Plaintiff submitted May 12, 2014 formal grievance # 509294 (509294) complaining of his property being wrongfully taken and destroyed, prison offizials ~~continued~~ agreeing to act wrongfully and some of those acts being taken secondary to complaints made ~~agree~~ by Plaintiff against prison offizials, destruction and falsifization of documentation on and about Plaintiff's property, Gehlmann's and Hainsworth's refusals to take any corrective measures despite having knowledge that wrong-doing had and were taking place, Plaintiff's mattress being wrongfully taken, and, amongst other things, as to how prison offizials actions were part of an on-going pattern of wrongs committed by prison offizials toward Plaintiff. As relief in 509294 Plaintiff requested: punitive and compensatory damages, declaratory and prospective relief, reimbursement of costs associated with 509294, handheld camera footage from the May 9, 2014 search and the pod camera footage for the 0600-1400 hour shift of May 9, 2014 to the 0600-1400 hour shift of May 11, 2014 to be saved as evidence - of which Plaintiff also requested through Gehlmann - and all other available relief.

41. In yet another attempt to gain access to and possession of his extra and stored legal property, and due to the Exemption form stating it was Plaintiff's responsibility to request an extension of the Exemptions ~~authority~~ authorization prior to its expiration, Plaintiff submitted a May 22, 2014 DC-135A to Gehlmann requesting a one year extension of the Exemption while at the same time providing the captions to seven (7)

of Plaintiff's pending court cases that he was pursuing on his own and requesting that Gehlmann take immediate action to approve the extension of the Exemption and to prevent any difficulties from occuring with the Exemption as had previously occured. Though Plaintiff submitted this May 22, 2014 DC-135A to Gehlmann and it was Retrieved, and then forwarded to Gehlmann, by Sroka on May 27, 2014 – due to the weekend and Holiday – Gehlmann refused to respond to this DC-135A and/or grant an Exemption extension.

42. With the Knowledge that DOC Rules and Regulations prohibited them from doing so, Shaffer, Hause, Redmun and Flick gave false, inaccurate and improper testimony for the investigation and response to 509294 that misrepresented the facts of what took place and why those things took place during and after the May 9, 2014 search. Shaffer, Hause, Flick and Redmun did so by: alleging that only normal cell trash was taken and not logged on a DC-154A; alleging at one point that only normal cell trash was taken - i.e., destroyed- and not logged on a DC-154A and then alleging all destroyed property was logged on a DC-154A; alleging that all destroyed property was logged on the issued DC-154A's; and, alleging/- insinuating that there were more than one initial DC-154A that was destroyed and rewritten on two (2) new DC-154A's- testimony and allegations that were contradictory in itself and shown then and later, to be false/inaccurate by, and through, DOC records and reports.

43. With the knowledge that DOC Rules and Regulations prohibited him from doing so, Bakos responded to 509294 and assisted in attempting to circumvent the truth, conceal the wrong-doing Plaintiff and his property were subjected to, and falsified, inaccurately noted and misrepresented the facts, and then refused to perform the duties he was required to perform by DOC Rules and Regulations. Bakos did so by: responding to 509294 when he was involved in the May 9, 2014 search of SCI-Somerset's RHU and the events of that search were at issue in 509294; falsely alleging that the Exemption form did not indicate that the three extra boxes worth of legal property made reference to on the Exemption form was permitted in the cell with Plaintiff when the Exemption form specifically noted the policy, and page of that policy, that said that the extra property was for in the cell and the Exemption form gave indication that the extra legal property was permitted in the cell by stating that the Exemption form was to be taped outside the cell door as proof of the Exemptions approval; refusing to address every issue Plaintiff raised or relief he requested in 509294; and, though he cited

Policy within his Response to 509294 he Refused to cite the specific Policy Number, Section, etc.

44. In yet another attempt to gain access to and possession of his stored and extra legal property, Plaintiff complained to Gehlmann on June 19, 2014 when Gehlmann walked around SCI-Somerset's RHU, about not being provided access to or possession of his stored or legal property, not receiving any Response from Gehlmann for his May 11, 14 or 22, 2014 DC-135A's to Gehlmann about Plaintiff's Property and Exemption issues, and of the prior Exemption never being honored. Gehlmann responded that due to Plaintiff's continuous complaining that he would have staff take all of Plaintiff's property, that Hainsworth or someone else would have to address Plaintiff's Exemption Requests for he would not, and that if Plaintiff did get an Exemption approval it would not be honored just like the last one wasn't.

45. During the time period of December 18, 2013 through the ending of his employment as the superintendent of SCI-Somerset -i.e., the approximate date of June 30, 2014 - Gerald Rozum (Rozum) acted in violation of the duties he was mandated to work in accordance with under DOC Rules and Regulations and his sworn statement as the superintendent of an institution by assisting in and condoning/approving of denying Plaintiff access to and possession of his stored and extra legal property, the concealment of evidence/facts/issues, and the falsification, improper notation and misrepresentation of the facts. Rozum committed such violations by and for: though in Plaintiff's Dec. 18, 2013 administrative appeal of 485300 - of which Plaintiff submitted twice with the second time being secondary to a Request from Rozum for Reasons not noted in any policy or local procedure ever issued to Plaintiff- Rozum was informed of Plaintiff still not being provided with any of the extra legal property the Exemption approved him to possess and of the wrongful acts of SCI-Somerset staff Rozum Refused to provide Plaintiff with any response to that appeal that addressed any of the issues Raised within that properly submitted appeal; though through the filing of 498846, Harr's Response to 498846 and Plaintiff's properly submitted March 30, 2014 administrative appeal of 498846 Rozum was put on notice of Plaintiff still not Receiving and of the extra legal property the Exemption approved him to possess and Hainsworth said in her Response to 485300 that RHU staff would give Plaintiff and of the wrongful acts of SCI-Somerset staff causing actual injury, Rozum Refused to provide Plaintiff with any timely Response to that appeal that addressed any of the issues Raised for that appeal; though through the submission and administrative appeal of 509294 Rozum was put on notice of Plaintiff still not Receiving any of the extra legal property he was approved to possess, the legal property that he did possess was

wrongfully taken; and, amongst other things, the wrongful acts of SCI-Somerset staff that Plaintiff and his property were being and had been subjected to were part of an on-going pattern, Rozum refused to take any corrective measures, refused to provide a response to all of the issues raised, refused to enforce clearly established and mandatory Doc rules and regulations, refused to permit Plaintiff to possess the extra legal property — though at the time of its confiscation/destruction Plaintiff had the required approval to do so — in the cell, and signed his agreement with and approval of the actions and allegations of Shaffer, Flick, Redman, Hause, Rakos, and Snyder ; and, continuing a pattern of denials of Plaintiff gaining access to and possession of his stored and extra legal property for though Plaintiff made verbal and/or written attempts to get Rozum's approval to possess extra legal property and to possess extra legal property in the cell on April 29, May 2 and may 7, 2014, Rozum refused to address, respond to or approve Plaintiff's requests/-attempts, though as SCI-Somerset's superintendent he had the ultimate duty/authority to grant such.

46. Plaintiff continued to attempt to acquire access to and possession of his stored and extra legal property through Hainsworth by making verbal and/or written requests to her on May 1, June 10, July 8, August 28 (on this date to her as the Acting Deputy Superintendent of Facility Management as Gehlmann had retired), September 5, September 18 and October 3, 2014. In accordance with her Dec. 5, 2013 stated intention, Hainsworth refused to grant any of Plaintiff's requests though Plaintiff explained, and showed documentation to support majority of the explanations, as to how his pending and intended court cases required/called for him to need the property.

47. On the dates of August 4, August 15, August 28, September 18 and September 26, 2014 Plaintiff made verbal and/or written requests to the SCI-Somerset Superintendent Trevor Wingard (Wingard) to gain access to and possession of his stored and extra legal property. On and/or around these approximate dates and September 22, 2014, Wingard joined in, assisted in and condoned/approved of the on-going refusal to permit Plaintiff to gain access to and possession of his stored and extra legal property in violation of Doc Rules and regulations and his sworn statement as the superintendent of an institution. Wingard did so by and through and for: refusing to respond to Plaintiff's DC-135A's; after stating on Sept. 26, 2014 that he would ⓑ approve Plaintiff a three (3) box exemption after he talked to Shaffer, coming into agreement with Shaffer's Sept. 30, 2014 statement that

he would make sure Plaintiff didn't get any Exemptioned Property; and, secondary to the Remand of 509z94, working in accordance with Bakos's Sept. 19, 2014 statement that Plaintiff will not get any extra Exemptioned Property and that Remanded 509z94 and its Requested Relief would be denied by Wingard; Refusing to address every issue Raised; approving/condoning of the on-the-spot determination to destroy and carelessly handle Prisoner Property; using the fact that Gehlmann's approval of the Exemption expired after May 29, 2014 - for a date as late as Sept. 22, 2014 - as grounds to deny 509z94 and justify/Rationalize the events of which were noted in 509z94's paperwork; the falsification, improper notation and misrepresentation of the facts; Refusing to uphold and enforce the mandatory requirements of policy; and, Refusing to provide Plaintiff with, or direct that Plaintiff be provided with, access to and possession of his stored and extra legal property though he possessed the ultimate duty to do so as the Superintendent of SCI-Somerset.

48. In a continuing attempt to gain access to and possession of his stored and extra legal property, Plaintiff made Repeated verbal and/or written Requests and/or complaints to Swank, Hazen, Baker, McNiven and Harr on the dates of Mar. 6, Mar. 20, Mar. 23, Mar. 28, May 5, May 11, May 13, May 18, May 23, May 30, June 1, June 8, June 30, July 5, July 24, July 29, Aug. 18, Aug. 31 and Sept. 3, 2014, but Swank, Hazen, Baker, McNiven and Harr Refused to permit such access and possession though they had the authority/ability to do so themselves or direct others to do so, out of, and in, conspiracy with other prison officials, and though Plaintiff appropriately Requested such and was on the list to get access and possession. Swank, Hazen, Baker, McNiven and Harr did so by, for and through: Refusing to provide Plaintiff with access to and/or possession of his stored and/or extra legal property between March and August of 2014; Refusing to provide Plaintiff with Responses to his Mar. 6, Mar. 20, Mar. 23, Mar. 28, Apr. 18, May 5, May 13, May 30, June 30 and Aug. 18, 2014 DC-135A's to them Requesting access and possess and/or complaining of not gaining/acquiring the access and/or possession; Refusing to document Plaintiff's Requests for access and possession; Refusing to do, or order others to, Plaintiff's property exchanges on May 11, May 18, June 1, June 8 and July 5, 2014 though other prisoners exchanges were done and officials stated Plaintiff's name was listed for an exchange; and, on May 23, 2014 Baker was present when Plaintiff was being taken out of the law library and told Plaintiff that a property exchange would be done for him that night, but, later that same night, then said that a CO Weimer Refused to do a

PROPERTY exchange for the Plaintiff and he was in agreement with that Refusal.

49. Secondary to a Request that he provide the captions for his pending court cases - of which he provided- for an Exemption, Plaintiff submitted October 7, Oct. 12 and Oct. 21, 2014 DC-135A's to Unit Manager David Onstead (Onstead) about the Exemption Requesting the three (3) box approval that he previously had, citing who previously approved him to have the 3 boxes and where verification of such could be found, and of as to how the failure to approve, honor and enforce an Exemption had/was causing Plaintiff actual injury. Acting in violation of DOC Rules and Regulations, Onstead -acting as SCI-Somerset's RHU Unit Manager- took a course of action that assisted in, joined him in and continued an on-going Refusal to permit Plaintiff access to and possession of his stored and extra legal property. Onstead did so by and through and for: falsely alleging/insinuating that DOC Rules and Regulations only permitted one (1) extra box of Exemptioned property; falsely alleging that Plaintiff only Requested one (1) extra box of Exemptioned property; falsely alleged that Plaintiff Requested for Coutts to be closed; Refused to grant Plaintiff's Request to have three (3) extra boxes of Exemptioned property though Plaintiff showed a demonstrated need through the number of court cases he had and intended to initiate and, upon Onsteads Request, Referenced documented evidence of Plaintiff previously having a three (3) box Exemption approval; and, Refusing and failing to enforce the one (1) box Exemption that he did approve though he Received Notice of the issue by Plaintiff, and through Wingard, as late as November 7, 2014.

50. After Receiving Onstead's October 22, 2014 Notice of a one (1) extra box Exemption approval, and due to them being the immediate RHU staff that such issues are to be Raised to, Plaintiff made verbal and/or written Requests and/or complaints to Baker and Harr about gaining access to and possession of his stored and extra legal property. Harr and Baker, and, subsequently, Shaffer, acted in violation of DOC Rules and Regulations and acted out a continuance of the Refusal to permit Plaintiff the needed access and possession when he made his verbal and/or written Requests and/or complaints on Oct. 22, Oct. 23, Oct. 25, Oct. 26, Nov. 2, Nov. 4 and Nov. 16, 2016. Harr, Shaffer and Baker did so by and through and for: Refusing to provide Plaintiff with access and possession themselves and/or direct others to do so when they had the Required authority and ability to do so, and they Received and saw Notice of the Exemption's approval from, amongst others, Plaintiff,

Wineard and Onstead; Refusing to provide Plaintiff with access and possession themselves and/or direct others to do so saying and indicating that the Refusals were due to Plaintiff making verbal/written complaints against prison officials; and; Refusing to permit Plaintiff access and possession themselves and/or direct others to do so when other prisoners in the same area and similarly situated as Plaintiff were provided access and possession on days such as; including but not limited to; Nov. 2 and Nov. 16, 2014.

51. After Receiving Onstead's Oct. 22, 2014 notice of a one (1) extra box Exemption approval; and in a continuous attempt to gain access to and possession of his stored and extra legal property, Plaintiff made verbal and/or written Requests and/or complaints to Hainsworth on Oct. 23, Oct. 29, Oct. 31 and Nov. 6, 2014 about the inadequacy of Onstead's one (1) box Exemption approval for all of Plaintiff's pending and intended court cases, of needing the three (3) box Exemption he previously had; of not being provided any access to and possession of his stored and extra property, that she direct Shaffer, Baker, Harr and others to provide Plaintiff with access and possession, Request that she, as the Acting Deputy Superintendent of facility Manager, approve Plaintiff to have an Exemption for three (3) boxes due to having a need for that amount for his pending and intended court cases, and questioning as to why she had not provided Plaintiff with any Responses(s) to his DC-135A's to her. Acting in violation of DOC Rules and Regulations, Hainsworth did join in; assist in and approve/condone the continuance of the Refusal to permit Plaintiff to gain access to and possession of his stored and extra property - as she said she would do on Dec. 5, 2013. Hainsworth did so by and through and for; Refusing to permit and/or direct that Plaintiff be provided access and possession; Refusing to respond to Plaintiff's DC-135A's saying that if she Receives them from Plaintiff and they're about property she throws them away; Refusing to authorize, or direct that authorization be given for; Plaintiff to possess and have access to his stored and extra property in the amount of three (3) extra Exemptioned boxes of legal property or in an amount sufficient to meet his needs to pursue his pending an intended court cases; her Refusals being for the stated Reason of if it was left up to her Plaintiff would not have the one (1) extra Exemptioned box approved by Onstead; and; Refusing to enforce compliance with the Exemption approved by Onstead though she was put on notice by Plaintiff that the Exemption approval was not being honored by subordinate RHU officials.

52. In a continuance of the attempt to gain access to and possession of

his stored and extra legal property. On the dates of Oct. 22, Oct. 24 and Nov. 7, 2014 Plaintiff made verbal and/or written requests and/or complaints to Wingard about not being provided access and/or possession though Plaintiff had Exemption approval, as to if prison offizials at SCI-Somerset were willing to attempt to amicably resolve issues before they are taken to court. Harr and Baker refusing to provide Plaintiff with any access and/or possession like Wingard said Plaintiff would be provided, Onstead's Exemption approval of one (1) box being inadequate for Plaintiff's pending and intended court cases, and requesting he approve Plaintiff for an Exemption of three (3) extra legal boxes. Acting in violation of DOC Rules and Regulations and his duties and sworn statement as the superintendent of an institution, Wingard joined in, assisted in and approved/condoned the continuous refusal to permit Plaintiff to gain access to and possession of his stored and extra legal property. Wingard did so by and through and for: Refusing to respond to Plaintiff's DC-135A's; Refusing to address Plaintiff's issues/concerns; Refusing to enforce compliance with the Exemption approval; Refusing to approve an Exemption for three (3) extra boxes or for an amount adequate to Plaintiff's needs for his pending and intended court cases; though Plaintiff served Wingard with notice of the above noted issues/problems, refusing to take any corrective measures under the stated claim that refusing to attempt to resolve prisoners issues/problems was a part of the way things were done for the twenty (20) years that he had been a prison offizial and that prison offizials actions related to Plaintiff's property may be due to the amount of Plaintiff's time in solitary confinement; and, Refusing to work in accordance with, or enforce other SCI-Somerset prison offizials compliance with, DOC Rules and Regulations and lawful orders.

    53. Between the dates of July 8, 2014 and November 18, 2014 Plaintiff made thirty-nine (39) verbal and written requests and complaints about wanting to go to the SCI-Somerset RHU law library and not being permitted to go to Baker, Hazen, Burley, Harr, Onstead, Wingard, Officer Miller, Offizer Levadnuk, the Program Review Committee (PRC), Killinger and Shaffer. Though Plaintiff made specific note of his need to go to the law library and for extra time in the law library due to court cases-pending and intended- needing their issues to be researched; and of the diffizulties Plaintiff was experiencing with gaining access to the law library, Baker, Hazen, Burley, Harr, Onstead, Wingard, Shaffer and Killinger enacted and acted out a continuous refusal to permit Plaintiff access to the law library - of which is in violation of DOC Rules and Regulations. Killinger, Shaffer, Wingard, Onstead, Harr, Burley, Hazen and Baker did so by and through and for: Refusing to take Plaintiff's DC-135A's;

Refusing to document receiving Plaintiff's DC-135A's; Refusing to schedule Plaintiff to go to the law library; Refusing to respond to and return Plaintiff's DC-135A's; Refusing to direct that Plaintiff be taken to available law library time slots; Refusing to enforce DOC Rules and Regulations; Permitting and/or approving for Plaintiff to be wrongfully restricted from using the law library; Refusing to address the issue of Plaintiff not being provided access to the law library; and, amongst other things, making false allegations about the amount of access to the law library Plaintiff was being provided.

54. For the above issues, Plaintiff submitted formal grievances such as, including but not limited to, 485300, 498846, 499671, 506660, 509294, 514632, 518203, 525667 and 533527 to put prison officials on notice of these issues so that they may be resolved and, amongst other things, to exhaust administrative remedies as are available. Sroka knowingly joined in, assisted in and approved/condoned a conspiracy to act in violation of DOC Rules and Regulations with Harr, Shaffer, Bakos, Snyder, Rozum, Wingard, Hainsworth, and, amongst others, Gehlmann to retaliate against, discredit, defame and perpetuate lies against/about Plaintiff and his claims. Sroka did so by and through and for: withholding grievances from being date-stamped as received and from being processed into records/files until prison officials were given notice of the filing of a grievance and given the chance to correct the error grieved; assigning prison officials as grievance officers to respond to grievances, and allowing them to respond to them, that they were involved in the issues and/or events at issue in the grievances though DOC Rules and Regulations strictly prohibited her, and them, from doing so; Rejecting grievances from being processed for response(s) under the false, inaccurate and misrepresented pretenses; Refusing to perform her duty of making sure grievance responses were consistent with DOC Rules and Regulations; agreeing with and approving false, inaccurate and improper responses that did not conform to and were not consistent with, the facts and DOC Rules and Regulations; and, Refusing to report clear violations of DOC Rules and Regulations to her superiors.

55. Though the DOC code of ethics mandates that prison officials promptly report any information that comes to their attention that indicates a violation of law and/or the DOC's Rules and Regulations to their supervisor, between the dates of November 8, 2013 and approximately Nov. 18, 2014 Baker, Hazen, Burley, Gehlmann, Killinger, Bakos, Onstead, Snyder, Hainsworth, Flick, Rozum, Wingard, Sroka, Hause, Harr, Shaffer, Kim, Swank and Mc'Niven all joined in, acted out, assisted in, failed/refused to prevent/stop, and condoned/approved of an on-going conspiracy to conceal, and continue to act out, their subjection of Plaintiff and his property's Rights, Privileges and immunities to

violations. Baker, Hazen, Burley, Gehlmann, Killinger, Bakos, Onstead, Snyder, Sroka, Hainsworth, Flick, Rozum, Wingard, Harr, Hause, Shaffer, Kim, Swank and McNiven did so - despite being put on notice of the existance of a conspiracy - by and through and for: Refusing to promptly report the destruction of and damage to Plaintiff's property; Refusing to report the entering of false, inaccurate and misrepresented allegations on documents and in records presented as facts; agreeing to wrongfully destroy Plaintiff's property, and then conceal the destruction; agreeing to enter, or cause to be entered, false, inaccurate and misrepresented allegations on documents and in records and present them as facts; destroy documentation on and/or about Plaintiff's property and the events that took place; Refusing to address, respond to and/or document Plaintiff's requests/complaints about issues/events; entering, or causing to be entered, false, inaccurate and misrepresented allegations on documents and in records and present them as facts; assigning prison officials to address/respond to complaints about the same officials; disregarding evidence of prison officials wrong-doing; agreeing to subject Plaintiff and his property to wrong-doing; Refusing work in accordance with, and/or directing other SCI-Somerset staff to work in accordance with, DOC Rules and Regulations; and, amongst other things, directing, and/or approving/condoning of and assisting, other prison officials to commit acts that violated the law and DOC Rules and Regulations toward and involving Plaintiff and his property.

56. Prison officials such as, including but not limited to, Shaffer, Hause, Redmon, Flick, Bakos, Rozum, and Wingard then Refused to Reimburse and/or compensate Plaintiff for his destroyed three (3) pens, seven (7) photographs, four (4) books and four (4) magazines when they were destroyed beyond repair while under the control of prison officials and DOC Rules and Regulations state that when prisoner property is damaged/destroyed due to staff neglegence - of which Shaffer, Hause, Redmon and Flick were during the May 9, 2014 handling of Plaintiff's property- prison officials will Reimburse/compensate the prisoner.

## I. Legal Claims

Plaintiff Realleges and incorporates by Reference Paragraphs 1-56.

### Access To Court

57. Gehlmann Refused to approve, and/or give notice of the approval of, the Exemption from Oct. 11, 2013 until the Nov. 13, 2013 Processing of 485300, Refused to enforce compliance with his approval of the Exemption for Plaintiff to have three (3) extra boxes of legal Property in the cell with him between Nov. 13, 2013 and May 29, 2014, Refused to grant an Extension of the Exemption between May 22, 2014 and June 19, 2014, Refused to provide, and/or direct that other Prison officials Provide, Plaintiff with access to and/or Possession of his stored and/or extra legal Property between May 13, 2013 and June 19, 2014, and Refused to direct that Plaintiff be Returned his legal Property on May 9, 2014.

58. Hainsworth denied Plaintiff access to and possession of his stored and extra legal Property on Dec. 5, 2013 in her denial of 485300 and its Requested Relief, denied Plaintiff the 3 boxes of Exemptioned legal Property by directing other Prison officials not to give him such between Dec. 5, 2013 and May 29, 2014, Refused to Provide, and/or direct other Prison officials to Provide, Plaintiff with access to and possession of his stored and extra legal Property on May 1, Oct. 3, Oct. 23 and Nov. 6, 2014, Refused to enforce compliance with Gehlmann's approval of the Exemption - that she verified Herself - between Dec. 5, 2013 and May 29, 2014, and Refused to direct that Plaintiff be Returned his legal Property on May 9, 2014.

59. Harr, Kim, Swank, Baker, McNiven, Hazen and Burley Refused to Provide, and/or direct that other Prison officials Provide, Plaintiff with access to and possession of his stored and extra legal Property between Dec. 5, 2013 and Nov. 16, 2014, despite Exemption approvals.

60. Harr denied Plaintiff access to and possession of his stored and extra legal Property of the 3 Exemptioned boxes of Property in his denial of 498846 and its Requested Relief.

61. Shaffer, Hause, Redmon and Flick destroyed the complaint and Research notes for the issues noted in Paragraph 5 above, destroyed the documents and Research notes for the issues noted in Paragraphs 9 and 10 above, destroyed two (2) Prisoner declarations that Plaintiff was able to acquire to Replace declarations Previously stolen by Sci-Somerset officials to substantiate claims in Coutts, and took all the

legal property Plaintiff had for Coutts and two (2) of his other pending court cases

62. Onstead Refused to grant Plaintiff a 3 box Exemption or to enforce the Oct. 22, 2014 one (1) box Exemption he approved Plaintiff to have between Oct. 7 and Nov. 7, 2014.

63. Winsard Refused to provide, and/or direct that other prison officials provide, Plaintiff with access to and possession of his stored and extra legal property, Refused to approve Plaintiff an Exemption of 3 boxes of legal property or in an amount sufficient to meet his litigation needs, and Refused to enforce compliance with the one (1) box Exemption that Onstead did approve between Aus. 4 and Nov. 7, 2014.

64. Winsard, Onstead, Shaffer, Harr, Baker, Hazen, Burley and Killinger denied Plaintiff law library access approximately 39 times between July 8 and Nov. 18, 2014 by Refusing to take Plaintiff's DC-135A's Requesting to go to the law library, Refusing to schedule Plaintiff to go to the law library, Refusing to direct other prison officials to take Plaintiff to available law library time slots, and permitting/approving Plaintiff to be Restricted from law library access for reasons not authorized by DOC Rules and Regulations.

65. Rozum Refused to provide, and/or direct that other prison officials provide, Plaintiff with access to and possession of his stored and extra legal property, and denied Plaintiff access to and possession of his stored and extra legal property on and/or around the approximate dates of Dec. 18, 2013, Mar. 30, Apr. 29, May 2, May 7 and June 26, 2014.

66. Due to the actions of defendants Rozum, Winsard, Gehlmann, Hainsworth, Onstead, Harr, Shaffer, Kim, Swank, McNiven, Baker, Hazen, Burley, Redmon, Hause and Flick as described above, Plaintiff was: unable submit to and Petition to the Courts the claims and Reliefs made note of in paragraphs 5, 6, 7, 8, 9, 10 and 11 above before the statute of limitations expired on these claims; Plaintiff was unable to ~~adequately~~ adequately and diligently Research, pursue and defend/oppose claims against and defenses Raised by/for/on the behalf of defendants John Doe and Jane Doe before they were dismissed from Pitkins, as noted in paragraph 12 above; Plaintiff was/is unable to adequately and diligently pursue and Research the claims in Coutts or to submit fact based witness testimony to substantiate the claims in Coutts against the defendants in Coutts for monetary, declaratory, prospective, etc., Relief, as noted in paragraph

13 above; and, Plaintiff was unable to adequately and diligently research and pursue <u>Klopotosky</u> and prepare and submit proper copies of an appellate brief and Reproduced Record to secure a Remand and pursue a state tort action against sci-Camp Hill Prison officials prior to <u>Klopotosky</u> being dismissed due to Plaintiff not filing an appellate brief and Reproduced Record, as noted in paragraph 14 above.

67. These actions of defendants Rozum, Wingard, Gehlmann, Hainsworth, Onstead, Harr, shaffer, Kim, Swank, McNiven, Baker, Hazen, Burley, Redmun, Hause and Flick caused Plaintiff actual injury and denied him, and violated his Right to, access to court under the Petition Clause of the United States Constitutions First Amendment.


<u>Retaliation</u>

68. Hainsworth threatened the Plaintiff on Dec. 5, 2013 that if he Refused to withdraw 485300 that she would make it difficult for him to get his extra legal property, denied 485300 and its Requested Relief - for example, to get the three (3) extra box Exemption Plaintiff previously had, amongst other things - due to Plaintiff Refusing to withdraw 485300, directed other Prison officials not to give Plaintiff access to and/or possession of his stored and/or extra legal property due to Refusing to withdraw 485300, Refused to grant, and/or direct that other Prison officials grant, Plaintiff access to and/or possession of his stored and/or extra legal property or an extra Exemption adequate to meet his litigation needs, and Refused to enforce the Exemption's approved by Gehlmann and Onstead - all of which happened in accordance with her Dec. 5, 2013 stated intent to make it difficult for Plaintiff to get his property due to Refusing to withdraw 485300 on and between the dates of Dec. 5, 2013, Apr. 30, 2014, May 1, May 9, June 10, July 8, Aug. 28, Sept. 5, Sept. 18, Oct. 3, Oct. 23, Oct. 29, Oct. 31 and Nov. 10, 2014

69. Shaffer directing Redmun, Flick and Hause to take all of Plaintiff's legal property on May 9, 2014 due to grievances Plaintiff previously filed against Shaffer, directing Hause and Redmun to take Plaintiff's mattress on May 9, 2014 due to Plaintiff complaining about the Prison offizials actions during the same dated search, and directed that Prison officials - for example, Hazen and Killinger - not Return Plaintiff's mattress until he

stopped complaining about prison offizials actions on and after May 9, 2014.

70. Gehlmann threatened Plaintiff on June 19, 2014 that he would have other prison offizials take all of Plaintiff's property due to Plaintiff's continuous complaining about prison officials misconduct.

71. Harr refused to do, and/or direct other prison offizials do, Plaintiff's legal property exchange(s) and/or provide Plaintiff with access to and/or possession of his stored and/or extra legal property — even when an Exemption for Plaintiff to have extra property were in effect — on, about and between the dates of Nov. 13, 2013, Dec. 6, 2013, Mar. 14, 2014, July 24, July 29, Aug. 31, Sept. 3 and Nov. 4, 2014 with Harr saying on Nov. 4, 2014 that he refused to do so or to direct Baker to do so because Plaintiff was a "Rat" and "snitch" — i.e., a person who provided verbal and/or written testimony against/about another person.

72. Baker refused to provide, and/or direct that other prison offizials to provide, Plaintiff with access to and/or possession of his stored and/or extra legal property — when Plaintiff had a standing Exemption to have such — due to Plaintiff making complaints against prison officials on, about and between the dates of Mar. 23, 2014, May 23, June 30, July 8, Aug. 13, Sept. 11, Oct. 23 and Nov. 2, 2014 — even when other similarly situated prisoners were on and/or around these dates — with Baker saying on Nov. 2, 2014 that he was refusing to do so and then saying to Plaintiff, "you're a snitch, and stop filing lawsuits."

73. Due to Plaintiff choosing to engage in the constitutionally protected conduct of choosing to pursue — Rather than withdraw — his claims against prison offizials in grievance 485300, making verbal complaints about/against the wrong-doings — retaliatory and otherwise — of prison officials toward him, his property and his rights, and initiating civil lawsuits against prison offizials, defendants Hainsworth, Shaffer, Gehlmann, Harr and Baker subjected Plaintiff to the adverse actions of: denials of access to and possession of his stored and extra legal property for approximately thirteen (13) months & had the legal property he had and/or accumulated taken wrongfully that resulted in, amongst other things, Plaintiff to lose Klopotosky to dismissal, dismissal of John Doe and Jane Doe and the claims against them in Pitkins, prevents the presentation of fact based witness testimony to substantiate

claims in <u>Coutts</u> and was the key factors in Plaintiff's inability to pursue <u>Coutts</u>; and to be unable to initiate and pursue the claims in the courts and for the reliefs made note of in paragraphs 5, 6, 7, 8, 9, 10 and 11 above; threats against Plaintiff and his property that were sufficient to put a person such as Plaintiff in a reasonable state of fear to the point of not wanting to maintain ordinary firmness for the threat was not just being acted out at that time but had been acted out during Plaintiff's two (2) prior stays at SCI-Somerset by some of the same prison officials; ~~could~~ the loss of and irrepairable damage/destruction of his property; and, having to sleep on cold, hard steel on May 9, May 10 and May 11, 2014. This all constitutes retaliation under the Free Speech Clause and Petition Clause of the U.S. Constitution.

<u>Conspiracy</u>

74. At the times mentioned in this complaint, defendants ~~all~~ Rozum, Hauser, Wingard, Gehlmann, Hainsworth, Sroka, Onstead, Snyder, Bakos, Shaffer, Harr, Killinger, Burley, Hazen, Baker, Swank, McNiven, Redmun, Flick and Kim were all trained employee of the Doc at SCI-Somerset with multiple years as prison officials, with all having some form of daily and/or weekly inter-actions with each other. As employees at SCI-Somerset, and often working in the same area(s) and/or shift(s), they often employ a practice of a "pass-on" system - in which they "pass-on" information of what has and/or is to occur - to relay information to other prison officials.

75. Defendant Sroka participated in a conspiracy against Plaintiff with the other named defendants to conceal prison officials wrong-doing, to discredit Plaintiff and his claims against prison officials, to deprive Plaintiff of the relief due him for the injury him and his property were subjected to; and to perpetuate a code of silence within SCI-Somerset. Sroka did so by and through and for: though she received grievance 485300 on Nov. 8, 2013 she withheld it from being dated-stamped as received by her and from being processed for response until Nov. 13, 2013 to inform Gehlmann that 485300 had been filed and for him to ~~to~~ quickly approve the Exemption and make it appear as if the approval was given prior to the filing of 485300; assigning Harr as the grievance officer to respond to grievance 498846 when she knew policy restricted her from doing so due to Harr being named as involved in the subject matter of 498846; approved Harr's response to 498846 when she knew

HARR was restricted from responding due to him being named as involved in the subject matter of 498846 and the response did not conform to DOC Rules and Regulations; assigned Bakos to serve as the grievance officer to respond to grievance 509294 when she knew policy restricted her from doing so due to Bakos being involved in the search of the RHU at issue in 509294; approving Bakos's response to 509294 did not conform to policy; rejecting grievance 525667 as being illegible when it was ~~actually~~ legible; approving the response to grievance 533527 when it did not conform to policy; and agreeing with and approving the above errors to occur when it was her mandated duty to make sure they did not. The same occured with grievance 518203.

76. Defendants Burley and Harr refused to ~~also~~ provide Plaintiff with the three (3) boxes of extra Exemptioned property on direction of, and in agreement with, Hainsworth on Dec. 6, 2013 though both received notice of the Exemption approval.

77. Defendants Snyder and Shaffer came to a verbal agreement on May 9, 2014 to wrongfully take Plaintiff's property despite an Exemption being in effect at that time that they both had notice of.

78. Defendants Redmon and Hause took Plaintiff's mattress on May 9, 2014 on direction of, and in agreement with, Shaffer for making complaints about their conduct during the search.

79. Defendants Shaffer, Redmon and Hause all agreed to, and did, take steps to deprive, and conceal the deprivation of, Plaintiff of his property on May 9, 2014 by authoring and signing into agreement with it being falsely and inaccurately alleged on DC-154A # 8098684 that on May 9, 2014 Plaintiff was only permitted one (1) box of cell contents and that Plaintiff refused to choose what property to keep.

80. Defendants Shaffer and Flick both agreed to, and did, take steps to conceal the destruction of Plaintiff's property, and what that property actually was, on May 9, 2014 by authoring, and signing in agreement with, it being falsely and inaccurately alleged on DC-154A # 8098686 that random items picked out of a trashbag, that had been through approximately 7 other cells, belonged to Plaintiff.

81. Defendant Shaffer took steps to aide in the conspiracy to conceal the wrong-doing Plaintiff and his property were subjected to by prison officials. Shaffer did so by and through and for: refusing to provide Plaintiff with a copy of his response to grievance 506600; destroying 2 DC-154A's during the May 9, 2014 about Plaintiff's property; directing

prison officials to not issue DC-154A's on Plaintiff's property during the May 9, 2014 search; directing prison officials to destroy the trashbag that contained Plaintiff's property on May 9, 2014; giving false testimony for the investigation and response for 509294 about the DC-154A's used and destroyed during the May 9, 2014 search; and, giving false testimony for the response he gave to 506600.

82. Defendants Harr, Shaffer, Kim, Swank, McNiven, Baker, Hazen and Burley did act out a conspiracy within SCI-Somerset's RHU between approximately Nov. 13, 2013 and May 29, 2014 to deny Plaintiff access to and possession of his stored and extr legal property. Burley, Hazen, Baker, McNiven, Swank, Kim, Shaffer and Harr did so by, through and for though Shaffer and Harr were personally were provided copies of the Exemption's approval, Hainsworth said in her response to 485300 that RHU staff - of which they all were- would provide Plaintiff with his Exemption property, Plaintiff made numerous verbal and/or written requests to gain the access and possession to them while showing the Exemption form and Hainsworth's response to 485300 saying Plaintiff would be provided such, and Plaintiff filed grievances 498846, 506600 and 509294 about never getting the Exemptioned property, the Exemption's approval being violated and the injury such things were and had caused, they all made the exact same decisions to deny Plaintiff access to and possession of his stored and extra legal property and refused to document Plaintiff's requests during this time period that they all worked with and/or around each other in the RHU. then, in furtherance of that conspiracy, all gave the same and/or similar false testimony about Plaintiff's requests for and access to and possession of his property.

83. Defendant Bakos joined in and assisted in the conspiracy to conceal the wrong-doing Plaintiff and his property were subjected to between Oct. 10, 2013 and June 3, 2014 in his June 3, 2014 response to grievance 509294. Bakos did so by, through and for: falsely alleging that the Exemption form did not indicate that Plaintiff was allowed to have extra legal property in the cell with him; refusing to address every issue Plaintiff raised in 509294; refusing to review and/or preserve fact based evidence; and refusing

to provide a full and complete response to 509294.

84. Defendant Rozum joined in and assisted in the conspiracy to deprive, and concealment of the deprivations, Plaintiff of access to and possession of his stored and extra legal property and to subject, and concealment of the subjections of, Plaintiff and his property to wrong-doing by prison officials between Dec. 18, 2013 and June 26, 2014. Rozum did so by, through and for: though through the writing and/or appeals of grievances 485300, 498846, 499671, 506060 and 509294 Plaintiff put Rozum on notice of prison officials systematically refusing to provide him access and/or possession, and of damage to and/or destruction of Plaintiff's property and of the wrongs being an on-going, concerted practice with Plaintiff in the RHU, Rozum refused to take any corrective measures to stop, prevent the continuance of and/or remedy the wrongs; though Plaintiff submitted appeals of 485300, 498846 and 509294 that were in accordance with policy, Rozum refused to address them at all and/or fully in accordance with policy; and, refused to enforce compliance with policy on prison officials.

85. Defendants Shaffer, Harr, Baker, Hazen, Burley and Killinger conspired to and did deny Plaintiff law library access between July 8 and Nov. 18, 2014 by all making the exact same decisions within SCI-Somerset's RHU during this time to refuse to take Plaintiff's DC-135A's requesting to go to the law library, refusing to schedule, take and/or direct that Plaintiff be taken to available law library slots, and refusing to document Plaintiff's requests to go to the law library.

86. Defendant Onstead joined in and assisted in the conspiracy to deprive, and concealment of the deprivation of, Plaintiff of access to the law library by falsely alleging on the approximate date of Aug. 13, 2014 that Plaintiff was using the law library more than policy allowed when Plaintiff had not used the law library at that time since July 6, 2014.

87. Defendants Baker, McNiven, Hazen and Harr all conspired to, and did, deny Plaintiff access to and possession of his stored and extra legal property by, through and for all made the exact same decisions within the RHU between June 1 and Nov. 16, 2014

to deny Plaintiff access and/or possession; disregarding the Oct. 22, 2014 Exemption approval; refusing to direct other prison officials to provide Plaintiff with access and/or possession; and; refusing to document Plaintiff's requests for access and/or possession.

88. Defendants Wingard, Hainsworth and Onstead joined in and assisted in the conspiracy to deprive, and concealment of the deprivations of, Plaintiff of access to and possession of his stored and extra legal property and access to the law library between the approximate dates of July 16 and Nov. 7, 2014. Wingard, Onstead and Hainsworth did so by, through and for: Refusing to grant an Exemption at all or in an amount sufficient to meet Plaintiff's litigation needs; Refusing to enforce compliance with the Oct. 22, 2014 Exemption approval; Refusing to direct prison officials to provide access and possession or access to the law library; falsely alleging what policy said and/or allowed; Refusing to take corrective measures to stop, prevent continuation of and/or remedy the wrongs; falsely alleging the things that had and/or were occuring; and; Refused to respond to Plaintiff's complaints/requests at all and/or in full.

89. Defendants were aware of Plaintiff being a frequent filer of administrative complaints and appeals and of being a litigator with multiple pending and/or intended court cases — with some knowing due to those complaints and/or cases being against them. Many, if not all, of the Defendants were aware of the burden and procedures of administrative remedies and court cases due to being the subjects/defendants of them and due to the nature of their jobs. In conspiring to, and acting out that conspiracy, deprive Plaintiff of law library access and access to and possession of his stored and extra legal property, destroying Plaintiff's legal property, taking Plaintiff's legal property, and subjecting Plaintiff to adverse actions, may, and more than likely would, negatively effect Plaintiff pursual of cases and complaints — especially due to it being Plaintiff's third time of being at SCI-Somerset — for which Plaintiff did lose ten.

90. The actions of the Defendants constitute conspiracy under the U.S. Constitution; conspiracy to interfere with civil

Rights under 42 U.S.C. §1985(2) and (3), and failure to prevent conspiracy under 42 U.S.C. §1986.

91. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described within this complaint. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this court grants the declaratory and prospective relief that Plaintiff seeks.

## VI. Relief Requested

WHEREFORE, Plaintiff requests that this court enters judgement:

92. Granting Plaintiff a declaration that the acts and omissions described in this complaint constitute violations of his rights under the Constitutions and laws of the United States, and constitutes conspiracy to interfere with civil rights under 42 U.S.C. §1985(2) and (3), and constitutes the failure to prevent conspiracy under 42 U.S.C. §1986.

93. Issue preliminary and permanent injunctions sufficient to rectify the unconstitutional acts, policies and practices made note of in this complaint.

94. A jury trial on all issues triable by jury.

95. Compensatory damages jointly and severally against all of the defendants in an amount to be determined by a jury.

96. Punitive damages jointly and severally against all of the defendants in an amount to be determined by a jury.

97. Granting Plaintiff attorney fees and all other costs in this suit.

98. Grant Plaintiff any and all other relief this court deems just, proper and equitable.

Plaintiff hereby affirms that the foregoing is true and and correct to the best of my personal knowledge and made subject to the penalties of unsworn falsification to authorities.

Respectfully Submitted,

Aaron Sloan

United States District Court For the
Western District Of Pennsylvania

Aaron Sloan,
        Pro Se Plaintiff
                v.
Melissa Hainsworth, et al.,
        Defendants

C.A. No. 3:14-cv-00249
Jury Trial Demanded
District Judge Gibson
Magistrate Judge Baxter

## Certificate Of Service

Plaintiff hereby affirms that a true and correct copy of the Amended Complaint was served on the following via U.S. First Class mail:

Office Of Attorney General
564 Forbes Avenue
Pittsburgh, Pa. 15219

July 21, 2016

Respectfully Submitted,

A Wali Ibn Al-Islam Abd-Ali
Aaron Sloan GH-2977
SCI-Greene
175 Progress Drive
Waynesburg, Pa. 15370